

**FILED**

March 24, 2008

Cecil Crowson, Jr.
Appellate Court Clerk

## IN THE TENNESSEE COURT OF CRIMINAL APPEALS
### AT JACKSON
### JULY 1996 SESSION

| | | |
|---|---|---|
| **STATE OF TENNESSEE,** | ) | |
| | ) | |
| Appellee, | ) | **C.C.A. NO. 02C01-9506-CC-00164** |
| | ) | |
| VS. | ) | **GIBSON COUNTY (TRANSFERRED** |
| | ) | **FROM MONTGOMERY COUNTY)** |
| | ) | |
| **RONNIE MICHAEL CAUTHERN,** | ) | **HONORABLE DICK JERMAN, JR.** |
| | ) | |
| Appellant. | ) | (Sentencing-Death Penalty) |

For the Appellant

Hugh Reid Poland, Jr.
408 Franklin Street
Clarksville, TN 37040


Robert T. Bateman
221 South Third Street
Clarksville, TN 37040

For the Appellee

Charles W. Burson
    Attorney General and Reporter
450 James Robertson Pkwy.
Nashville, TN 37243-0493

    John P. Cauley
Assistant Attorney General
450 James Robertson Pkwy.
Nashville, TN 37243-0493

Clayburn Peeples
District Attorney General
109 E. First Street
Trenton, TN 38382

John Carney
District Attorney General
204 Franklin Street, Suite 200
Clarksville, TN 37040

Steve Garrett
Assistant District Attorney General
204 Franklin Street, Suite 200
Clarksville, TN 37040


OPINION FILED: _____

DEATH PENALTY AFFIRMED

DAVID H. WELLES
JUDGE

# OPINION

The original trial of this case took place in Montgomery County. Judge John H. Peay presided over the trial of the appellant and his co-defendant, Brett Patterson, which resulted in two convictions for felony murder, one conviction for first degree burglary, and one conviction for aggravated rape for each defendant. The jury sentenced the appellant to death. The appellant's co-defendant received a life sentence. On direct appeal to the Supreme Court, the appellant's convictions were affirmed, but the death penalty was set aside and the case was remanded for a new sentencing hearing. State v. Cauthern, 778 S.W.2d 39 (Tenn. 1989). On remand, Judge Peay granted the appellant's motion to transfer the case out of Montgomery County. The new sentencing hearing was held in Gibson County.

Upon the sentencing hearing in Gibson County, the appellant received one life sentence and one death sentence for his two murder convictions. As to the death sentence, the jury found one aggravating circumstance, that the murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death. See T.C.A. § 39-13-204(i)(5). The jury further found that the aggravating circumstance outweighed the evidence of mitigating circumstances beyond a reasonable doubt.

In this appeal, the appellant raises numerous issues attacking the validity of the death sentence imposed. Having reviewed the various claims, we find no reversible error and thus affirm the judgment of the trial court.

**BACKGROUND**

Because this appeal pertains only to the new sentencing hearing that was ordered by the Supreme Court, the evidence introduced primarily addresses the applicability of the aggravating and mitigating circumstances. In short, the appellant and his co-defendant, Brett Patterson, broke into the residence of Patrick and Rosemary Smith with the apparent intention of stealing money. Once inside the house, however, the two men strangled Mr. Smith and raped and strangled his wife. They also stole several items from the Smiths' residence, including a purse, credit cards, checks, clothing, and jewelry. The two individuals were ultimately apprehended when the police received a tip from an acquaintance of the two defendants. For a more detailed description of the crimes, see State v. Cauthern, 778 S.W.2d 39 (Tenn. 1989), and State v. Brett Patterson, No. 88-245-3, Montgomery County (Tenn. Crim. App., Nashville, Dec. 8, 1989). The death sentence imposed on remand pertained to the killing of Mrs. Smith.

Upon answering a call on January 9, 1987, of a possible burglary in progress, Officer John Robert Nichols of the Clarksville Police Department arrived at the Smiths' residence in Clarksville, Tennessee. The back door of the house appeared to have been kicked open and the window on the door was shattered. Officer Nichols testified that the basement of the house looked ransacked. When he went upstairs to further inspect the premises, he found the nude body of a woman lying on the floor in the first bedroom he came upon. A scarf was tied around the woman's neck with a vase entwined within the scarf as sort of a tourniquet. In the back bedroom, he found the body of a man kneeling against the bed with his face on the mattress. Officer Nichols testified that the discoloration around the man's neck indicated that he might have been strangled. Officer Nichols further testified that the room was in disarray: the bed frame was broken, the mattress was lying on

the floor, and furniture had been moved.

Dr. Charles Harlan, Chief Medical Examiner for the State of Tennessee, performed the autopsies on the two victims. He concluded that both victims died as a result of ligature strangulations. He opined that the victims could have died three to six minutes after the initiation of the strangulation, but that they may have been rendered unconscious as quickly as thirty seconds into the acts. Dr. Harlan testified that probably more than eleven pounds per square inch of pressure was applied to Mr. Smith's neck, thereby causing death by halting the blood supply to the brain. Dr. Harlan found multiple abrasions, lacerations, and contusions on the male victim's neck, lower lip, and left great toe. Some of the abrasions on the neck, he indicated, could have been caused by the victim's finger nails as he grabbed at his neck. Based upon the fracture of the thyroid cartilage in Mrs. Smith's neck, Dr. Harlan concluded that a force greater than thirty-four pounds per square inch caused her death. Dr. Harlan could not determine, however, whether either victim suffered repeated strangulations.

Detective Erle Crockarell of the Clarksville Police Department videotaped the crime scene. The tape, minus portions which were not relevant to the aggravating circumstance, was shown to the jury with the sound turned off. The defense objected to the showing of those segments depicting the officers moving the bodies in order to examine their undersides. The court, noting the objection, opined that those scenes were relevant to the establishment of the lone aggravator. The following is a summation of the portion of the tape that was shown:

The officer walks through the opened back door, which has a

shattered window. One of the officers is shown dusting the outline of a shoe print on the door near the knob. The basement looks in disarray: desk drawers opened and papers strewn about, closets opened. Upstairs, the furniture drawers in the living room are opened and various things are spread about the floor. There is a hammer on the floor in one of the sitting rooms and a microwave on the coffee table. The house appears to be rather neat in other respects.

In the hallway leading to the bedrooms, there are what appear to be labels from the tops of beverage bottles. In the first bedroom on the right, a woman's nude body is lying face down on the floor with a scarf tied around her neck. A vase is entwined within the scarf. A nightgown and undergarments are lying on the floor near the body. Also on the floor are flowers that appear to have come from the vase. The drawers on the dresser are opened, the closet door is opened and items are thrown about, and the bed cover is disheveled.

In the back bedroom, a man's body is shown kneeling against the bed with his face on the mattress. His body is wrapped in the bed cover. This bedroom also appears to be in disarray: the bed frame is off its hinges and the mattress is lying flush against the floor, the dresser and desk drawers and the closet doors are opened, and items are strewn about the floor. The camera captures a close-up on the man's hands and feet, which are bluish in color.

The officers remove the covers from the man and flip his body over. The skin on the front of his body is blue. Around his neck are abrasion marks, and his lips are bloodied. There is a blood stain on the bed where his face was lying. The video shows the officers examining the man's arms and legs, and also shows close-ups of his face and neck. The video then shows the officers cutting the vase out of the scarf and removing the scarf from around the woman's neck. The officers flip over the woman as well, and her skin and lips also have a bluish tint. While the officers are moving the bodies, it is obvious that rigor mortis has already occurred.

After the video was shown to the jury, Detective Crockarell elaborated as to what he observed. He stated that the lock mechanism on the back door was broken. Also, the phone line on the outside of the house was cut. Two bottle caps from "Bartles and James" wine coolers were found on the floor in the hallway next to the front bedroom. In the back bedroom, on each side of the bed, they noticed eyeglasses on the nightstands and house slippers on the floor. Two buttons from the nightgown in the front bedroom were torn off; one was found on the floor and the other on the bed. They noticed a semi-clear liquid in the front bedroom on the bed cover and on the floor next to the woman. After they removed the scarf, they

determined that it was indented about 1/8 inch into the woman's neck. He also testified that the width of the strangulation mark around the man's neck was about 1/16 inch wide. Detective Crockarell stated that they found the appellant's name on a piece of paper inside the residence.

Detective Crockarell further testified that on January 11 or 12, 1987, he received instructions to go to 112 Faith Drive in Clarksville for a development in the case. The building at this address was a duplex, one side being 112 Faith Drive and the other 114 Faith Drive. Upon arrival, Detective Crockarell observed from a distance the appellant, Brett Patterson and another individual working on a grey Camaro in the yard (the Detective stated that he had dealings with the appellant prior to this encounter). After about twenty minutes, Detective Crockarell and another officer detained the three men until a search warrant was obtained. They checked the men for weapons and secured the area so no one could leave. During the pat-down for weapons, they found a .38 caliber handgun inside the car.

Detective Steve Poston of the Clarksville Police Department executed the search warrant on the Faith Drive residences. 112 Faith Drive was in Brett Patterson's name and 114 was in Eric Barbee's name. Detective Poston testified that the wall between 112 and 114 Faith Drive had been knocked out, creating a walkway through the two residences. In the Camaro, they found checks, credit cards, and photo IDs bearing the victims' names, tools, the appellant's black leather jacket with some of the Smiths' credit cards and $150 in cash in the pocket, a stocking cap, black gloves, and 880 military cord. Inside the residence at 112 Faith Drive, the officers found two ski masks, black gloves, a grey Members' Only jacket with 880 military cord in the pocket, a .45 automatic handgun, a black purse containing Mrs. Smith's vehicle registration, Mr. Smith's receipt book with a receipt made out to the appellant, and the Smiths' car and house keys. Inside 114, they found a tote bag with a flashlight and a cold weather military mask.

Sergeant Charles Denton interviewed the appellant two times after the murders. The first interview on January 12, 1987, was an oral interview which was reduced to writing by the Sergeant afterwards. The appellant apparently refused to give a written statement. As the appellant answered the Sergeant's questions, the

Sergeant wrote the answers on a piece of paper. Sergeant Denton testified that he advised the appellant of his <u>Miranda</u> rights and that the appellant waived the same. Furthermore, the appellant reviewed what the Sergeant wrote and signed the statement. The following is a summation of that statement, which was read into evidence by Sergeant Denton:

> The appellant indicated that he first knew about the property taken in the burglary when Patterson told him. He said he read about the burglary in the paper but didn't know whose names were on the checks and credit cards. The appellant stated that he didn't see the checks or credit cards in the trunk of the Camaro until the morning of January 12. He said he knew nothing about a VCR. The appellant told the officer he did not break into the Smiths' house or tell anyone any information about the Smiths' house. He further stated that he knew Patterson broke into the house. Patterson told him he broke in the house, but didn't mention anything about any murders. The appellant stated that Patterson didn't give him anything from the robbery. Joe Denning was with Patterson on the night of the 8th. The appellant mentioned he owned a Toyota. He stated he did not know who committed the robbery at the Hornbuckle 66, but indicated that Denning and Patterson committed the burglary of the Smiths' place. (Defense counsel objected to the reference of the Hornbuckle robbery, but the objection was overruled). The appellant said he knew the stolen items were in the trunk of the Camaro when the police came to 112 Faith on January 12. He stated he did not own a mason's hammer. The appellant further stated that he did not tell Patterson about a robbery at the Hornbuckle 66.

The second interview, which was conducted on January 13, 1987, was taped by Sergeant Denton. Officer Joe Griffy was also present during the interview. After the appellant was advised of his rights, he indicated to the officers that his attorney told him not to talk unless he was present. The officers informed the appellant he could waive his rights and talk nonetheless, and the appellant said, "O.K." During the initial appeal of this cause, however, the tape recording of the statement was lost. A transcription of the tape recording exists, and this was read into evidence by Sergeant Denton during the hearing on remand.[1] The following is a summation of

---

[1] In reversing the death sentence and remanding the case to the trial court, the Supreme Court concluded that the admission of part of this statement by the appellant was not harmless error. Consequently, only the admissible section was read into evidence by Sergeant Denton. Initially, Sergeant Denton read the transcript of the statement which deleted any reference to Brett Patterson. Because, however, this trial pertained to sentencing only, and the guilt of both the appellant and Patterson had already been determined, the court allowed the Sergeant to return to the witness stand and relate to the jury the unedited portions of the transcript referring to

that transcript:

The appellant stated that Mrs. Smith told him to come by the house about 10:30 or 11:00 p.m. that night. He and Brett Patterson rode in the Camaro to the Smiths' residence. She told him to go to the back door, but it was locked. When the appellant started to leave, Patterson tried to kick the door, but it still wouldn't open. Patterson broke the window on the door and reached in and opened the door from the inside. He walked in and looked around with a flashlight. The appellant was still outside when Patterson came back out and cut the phone lines on the outside of the house.

They went upstairs to the back bedroom where the Smiths were sleeping. Mr. Smith sat up and yelled, "who is it?" Patterson grabbed Mr. Smith, flipped him over, and put a pillow over his head. Mr. Smith was yelling and Mrs. Smith tried to get out of the bed. The appellant told Mrs. Smith to go hide in the closet in the front bedroom. Patterson and Mr. Smith were fighting. The appellant tried to use the phone but didn't realize it was out. He went downstairs and when he came back up, Mr. Smith was dead. Patterson grabbed Mrs. Smith as she was coming back down the hallway and they went in the front bedroom. The appellant said Mrs. Smith took her clothes off voluntarily. She and Patterson did something in the bedroom and she came out and told the appellant she was sorry. The appellant said he did not rape her.

Patterson took a rope out of his pocket and went to the back bedroom and tied it around Mr. Smith's neck. Patterson then came to the front bedroom and was going to choke Mrs. Smith. The appellant asked him not to, but he did it anyway. He tied a scarf around her neck but she was still alive so he put a ball or something in the scarf and twisted it around her neck. They left the house, but the appellant said they didn't take anything.

The entire incident took place in less than thirty minutes. They used wire cutters from the appellant's tool box to cut the telephone wires. The appellant said he saw Mrs. Smith the night before about 7:00 p.m. He said she was at the Faith Drive residence and then they went out to eat. The appellant claimed he had been seeing Mrs. Smith off and on for some time and had sex with her twice before. He stated that he had done some work on the Smiths' Mercedes. Mrs. Smith would bring it by his place and drop it off; he never picked it up at their place.

The appellant stated he did not wear gloves or a ski mask the night of the murders. The appellant stated that Mrs. Smith consented to having sex with Patterson that night. She took her clothes off in front of them and laid down on the bed in the center bedroom. She told the appellant she was sorry, but she didn't ask about her husband. The

---

Patterson.

-8-

appellant said that Patterson drank two wine coolers. The appellant stated that he did not rape Mrs. Smith. He further stated that he didn't remove anything from the house but that he didn't know if Patterson did or not.

The appellant admitted that he knew that credit cards and a grey Members' Only jacket were taken. He said he did not know if a VCR was taken. The appellant denied taking a watch and ring from the house but stated that he gave a watch and ring to "Jackie" (Jaqueline Pigue) the next day. He also denied going to the Smiths' house to steal anything; he went there because Mrs. Smith invited him. The appellant stated that nothing in the house was disturbed when he left, i.e., dresser drawers or closet doors were not opened.

The appellant stated they took a purse from the house. Patterson brought a short rope with him, but the appellant denied having any rope. The appellant also denied touching either of the victims. The appellant stated Mr. Smith was not supposed to be there. The appellant also stated that Mrs. Smith told him she was going to get rid of her husband no matter what it took. The appellant said he didn't strangle either victim.

The appellant stated he had been to the Smiths' once before to pick up a check but never went inside the house. The appellant knew the Smiths for no more than a year. Both of them had been to his place before. He saw them once every two or three months. Mrs. Smith didn't offer any resistance that night; she gave sex willingly to both of them (even though earlier in his statement he denied having sex with her). While Patterson strangled Mr. Smith, the appellant was hiding Mrs. Smith in the closet and running out of the house. He went to the car to leave. He heard her scream so he came back inside.

The appellant doesn't know why he followed Patterson into the house after he broke the back door, but he admitted he could have run away. Since Patterson drove the Camaro that night, the appellant did not have the keys. He saw Patterson and Mr. Smith fighting and he ran to the phone near the kitchen. The appellant stated his fingerprints should be on the phone. When they left the house, the appellant stated that Patterson told him the Smiths were dead. He didn't call the police because he knew he would be a prime suspect. The appellant said he considered himself an accessory to murder.

Karen Rivetna, Mrs. Smith's sister, testified that she witnessed the appellant help Mr. Smith connect a VCR to a television in the basement of the Smiths' house. She also testified that she once rode with the Smiths to the appellant's place in order to drop off one of their cars on which the appellant was going to work. In addition,

Ms. Rivetna identified for the court Mrs. Smith's watch and wedding ring, as well as Mr. Smith's grey Members' Only jacket.

Jaqueline Pigue testified that she and the appellant dated for a while back in 1987. She stated that she had been seeing the appellant for about a month before the murders occurred. She also stated that she met Brett Patterson about two weeks before the murders. Ms. Pigue testified that she got off work around 9:30 p.m. the night of the murders, and met the appellant and Patterson at a local Arby's before heading to her night job as bartender at RockVegas. She indicated that the two men appeared to be on acid because "[t]hey weren't being the same as they always were. Usually, they were very happy go-lucky. They were being very solemn and being very quiet." She also testified that the appellant told her he had taken acid earlier in the week. According to Ms. Pigue, Patterson left in the Camaro before the appellant and her; she and the appellant left in her car. The appellant was wearing a black leather jacket and boots when she saw him that night.

Ms. Pigue testified that the day after the murders the appellant gave her a watch and wedding ring to hold for him so they would not get lost. The appellant told her that someone owed him money and he was keeping the watch and ring as collateral. He also told her that he was moving out of town. Ms. Pigue testified that the appellant was in a "happy go-lucky" type of mood when he gave her the watch and ring. He did not mention anything about the murders. Ms. Pigue further testified that she saw the appellant's photo associated with a news report about the Smith murders on the following Monday night. She was taken aback because she did not believe the appellant could do such a thing. After talking with her parents the next morning, Ms. Pigue gave to the police the items which which the appellant had given her.

Ms. Pigue also testified that the appellant had written her two letters about a month after his conviction. She only read the first one, but she destroyed both of them. The one she read did not mention anything about the crimes or his conviction; the appellant just asked how she was doing. She mentioned that there were "smiley faces" on the letter.

Joseph Frederick Denning, a high school friend of the appellant's, testified that about a week before the murders, the appellant inquired about buying a handgun. Denning took the appellant and Patterson to Nashville to purchase a .45 handgun from an acquaintance of his. The appellant gave Denning $50.00, which Denning gave to his acquaintance, and the acquaintance was going to come to Clarksville on January 10, 1987, to collect the remaining $200.00. Denning also testified that the appellant bought a .38 caliber handgun from him the previous year.

Denning testified that the appellant and Patterson came to his residence around 3:00 a.m. on January 9, 1987. He stated that both men were dressed nicely, and he said the appellant was hyperactive. The appellant told Denning that his girlfriend bought him the clothes he was wearing. The men asked Denning to go out with them, but Denning told them he was going to sleep. Denning further testified that the appellant was at his place the next morning when he awoke. The two of them then drove over and picked up Patterson. Denning testified that on the way back to his place, the appellant showed him some credit cards, a checkbook, a watch and ring, and asked him if he knew how to use stolen credit cards. Denning stated that the Smiths' name was on the credit cards. The appellant told him he was going to give the watch and ring to his girlfriend. Denning testified that Patterson told him something to the effect that he and the appellant already killed two people and killing one more would not matter.

Denning testified that the appellant again came to his place January 10, 1987. The appellant showed Denning a newspaper article about the murders and said "he was involved with the killings and that he was going to be famous and that they wouldn't catch him alive if they tried to catch him." The appellant told him that he tied a scarf around Mrs. Smith's neck, but since he did not have enough strength to kill her, he used a vase to help tighten the scarf. The appellant also told Denning that he raped the woman and poured "Bartles and James" wine coolers all over her. The appellant informed Denning that he cut the phone lines on the outside of the house, broke the window in the back door, and went upstairs and shined a flashlight in the Smiths' faces. The appellant said he tried to kill Mrs. Smith but could not, so he gathered stuff to steal and put it next to the back door. Denning testified that the appellant told him he and Patterson had rope, a penlight, and guns with them during

the crimes.  Denning also testified that he saw ski masks and gloves at Patterson's residence.

Denning stated that the appellant was acting "real excited" about the murders and about being famous.  Denning testified that Patterson said "he had to finish the job [strangling Mrs. Smith] for Ronnie because Ronnie . . . didn't have the strength to do it."  Patterson also told Denning that he killed Mr. Smith.  Finally, Denning testified that he was offered immunity on other unrelated matters in exchange for his testimony in this case.

James Phillips Andrews, a roommate of Joe Denning in January of 1987, testified that he met the appellant about a month before the murders.  He stated that the appellant and Brett Patterson stopped by their place every other day or so to visit.  Andrews testified that the appellant and Patterson came by his residence during the early morning hours of January 9, 1987, but that they did not stay long.

Andrews further testified that the appellant came to his residence later that same evening.  The appellant, Denning and Andrews were sitting around watching television when a report about reward money for the Smith murders was broadcast.  Andrews mentioned to the others he wish he knew who killed the couple so he could get the money.  The appellant told Andrews and Denning that he was the one.  The appellant told them some of the details about the incident, how they broke into the house of this couple for which he had done some work, went to the master bedroom, told the woman to get into the closet, strangled the man, and then raped the woman.  The appellant stated that he stole a VCR (which the appellant said he gave to his father), credit cards, and a wedding ring.  Andrews also testified that the appellant

-13-

informed him he wore gloves during the incident. Andrews testified that the appellant acted "proud" about what he did; "[t]o him, it was like a great trophy." Andrews admitted that in his statement to the police, he referred more to "they" or "them" rather than "he" when relating what the appellant had told him in regards to Patterson and his involvement in the incident. Finally, Andrews stated that the appellant threatened to kill him if he repeated anything the appellant told him.

Charles Tracy, a teacher at the Department of Correction, testified on behalf of the appellant. He testified that the appellant was one of his aides, and that the appellant obtained his GED while in prison. According to Tracy, the appellant works well with people, has good communication skills, is acceptable to supervision, and maintains good personal hygiene. Tracy testified that the appellant tutors others in gaining their GED and assists in grading papers. A letter of appreciation to the appellant signed by Tracy was introduced into evidence.

The appellant testified on his own behalf. He stated that he was born on September 5, 1967, and adopted and raised by his maternal grandmother and step grandfather. He never saw his natural father and only remembers seeing his natural mother several times. He testified that he did not learn until age fifteen that his grandmother adopted him. The appellant dropped out of school in the eleventh grade to help care for his grandmother, who suffered from Parkinson's disease, so his step grandfather could work outside the home. The appellant testified that he

-14-

worked on automobiles as a hobby, and was employed in a garage until age eighteen.

The appellant was married and divorced, and has a son from that marriage. His son, eight at the time of resentencing, visits the appellant in prison every three months or so. The appellant testified that he has remarried since he has been incarcerated. He received his GED in 1991, and also obtained certification as a legal assistant/paralegal in 1989, both while in prison. The appellant described his duties as a teacher's aide, and testified about a letter of appreciation from the teacher and from a correctional officer, and approving remarks by the review board. The appellant introduced greeting cards which he creates and sells in prison. Finally, the appellant testified that he corresponds regularly with doctors, health department officials, insurance companies, and rental agencies concerning his grandmother's condition and situation.

Before the appellant rested, the trial judge informed the jury that Brett Patterson received a life sentence for his two first degree murder convictions.

## SUFFICIENCY OF THE EVIDENCE[2]

The appellant argues that the evidence introduced at the re-sentencing hearing was insufficient to satisfy the application of the sole aggravating

---

[2] As an initial matter, the state argues that several issues raised on appeal have been waived because the appellant failed to timely object, T.R.A.P. 36(a), State v. Killebrew, 760 S.W.2d 228, 235 (Tenn. Crim. App. 1988), or raise the issue in the motion for new trial, T.R.A.P. 3(e), State v. Baker, 785 S.W.2d 132, 135 (Tenn. Crim. App. 1989). Because of the qualitative difference between death and other sentences, however, our Supreme Court has normally considered the merits of an issue even if the appellant did not contemporaneously object to the error or raise the issue in the motion for new trial. See State v. Bigbee, 885 S.W.2d 797, 805 (Tenn. 1994); State v. Duncan, 698 S.W.2d 63, 67-68 (Tenn. 1985); State v. Strouth, 620 S.W.2d 467, 471 (Tenn. 1981). Accordingly, we will consider these issues on their merits.

circumstance, that the murder was especially heinous, atrocious, or cruel. Specifically, the appellant relies on two factors in support of his argument: (1) evidence that the victim lost consciousness thirty seconds into the act, and (2) the fact that the appellant was not the one who actually killed the victim. The state argues in response that the evidence fully supports the jury's verdict. The fact that Patterson received a lesser sentence, according to the state, does not weigh into the sufficiency determination.

**(1).** The evidence presented during the re-sentencing hearing in this case shows that the two victims died as a result of ligature strangulation. The force of pressure applied to the neck of Mr. Smith was probably greater than eleven pounds per square inch, while the force applied to Mrs. Smith's neck equaled thirty-four pounds or more. Dr. Harlan testified that as a result of the strangulation, the thyroid cartilage surrounding the larynx in Mrs. Smith's neck was fractured. The flow of both blood and oxygen to the head ceased. Dr. Harlan testified that she did not die instantaneously, but rather within three to six minutes. Dr. Harlan testified further that she could have fallen unconscious within thirty seconds, but possibly later, after the initiation of the force to her neck. According to Dr. Harlan, several small abrasions on Mrs. Smith's neck, indicative of fingernail scratches, suggest that she possibly attempted to relieve the pressure being applied.

The testimony also suggests that the victim was raped before the strangulation. Though the appellant initially mentioned in his statement to the police that only Patterson raped Mrs. Smith, he later told the officers that he too had sex with Mrs. Smith that night. Moreover, the testimony of both Denning and Andrews indicates that the appellant told both of these witnesses he did in fact rape Mrs.

-16-

Smith. Dr. Harlan testified that he found a white sticky substance on the victim's body, but he did not determine exactly what it was. There is also testimony suggesting that the appellant and Patterson poured wine coolers over Mrs. Smith's body after the rapes. Furthermore, the rapes apparently occurred shortly after the strangulation of her husband. The couple was abruptly awakened in the middle of the night. Mrs. Smith started screaming, so the appellant "hid her" in the closet of the front bedroom, while his co-defendant fought with and strangled her husband in the master bedroom. Mrs. Smith was then raped and strangled to death.

The appellant argues that the evidence implying that the victim lost consciousness as early as thirty seconds into the ordeal is insufficient to support a finding of the sole aggravating circumstance. In addition, this Court has a statutory obligation to determine whether the jury's verdict is supported by the evidence. See Tenn. Code Ann. section 39-13-206(c)(1)(B). As is commonly recognized, the jury's verdict, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the State's theory. State v. Hatchett, 560 S.W.2d 627, 630 (Tenn. 1978); State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). On appeal, "the state is entitled to the strongest legitimate view of the trial evidence and all reasonable inferences which may be drawn therefrom." State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). This Court does not reweigh or reevaluate the evidence. Id. The jury's finding, therefore, will only be disturbed if, after a consideration of the evidence in the light most favorable to the State, a rational trier of fact could not have found the existence of the aggravating circumstance beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781 (1979); State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983).

Tennessee Code Annotated section 39-13-204(i)(5) provides that the death penalty may be imposed if the jury finds the State has proven beyond a reasonable doubt that "[t]he murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death."[3] In State v. Hodges, No. 01C01-9212-CR-00382 (Tenn. Crim. App., May 18, 1995), a panel of this Court held that "[s]trangulation alone does not establish the heinous, atrocious, or cruel aggravating factor." Slip op. at 15. Accordingly, there must be evidence of some torture or serious physical abuse above and beyond the nature of the strangulation in order to justify the heinous, atrocious, or cruel aggravator. See id. "Torture" has been defined as "the infliction of severe physical or mental pain upon the victim while he or she remains alive and conscious." State v. Williams, 690 S.W.2d 517, 529 (Tenn. 1985). "Serious physical abuse beyond that necessary to produce death" means just that; there must be serious physical, not mental, abuse, i.e., "an act that is 'excessive' or which makes 'improper use of a thing,' or which uses a thing 'in a manner contrary to the natural or legal rules for its use.'" State v. Odom, 928 S.W.2d 18, 26 (Tenn. 1996) (quoting Black's Law Dictionary 11 (6th ed. 1990)).

---

[3] The State notes, with which we agree, that although the trial court erroneously instructed the jury under the new language rather than the old language of the especially heinous, atrocious, or cruel aggravating circumstance (because of the date of the offense), the error was harmless as the instruction inured to the benefit of the appellant. See State v. Thompson, 03C01-9406-CR-00198 (Tenn. Crim. App. Jan. 24, 1996), perm. app. denied, concurring in results only, (Tenn. July 1, 1996).

Furthermore, the 1989 amendments to the death penalty statute mandate that the jury must find that the aggravating circumstances outweigh the mitigating circumstances "beyond a reasonable doubt" before it can impose the death penalty. Tenn. Code Ann. § 39-13-203 (Supp. 1989). Prior to the amendments, however, the jury simply had to find that the aggravating circumstances outweighed the mitigating circumstances. § 39-13-203 (1982). In the case before us, the trial judge erroneously instructed the jury under the new law rather than the law in existence at the time of the offense. See § 39-11-112. See also State v. Smith, 893 S.W.2d 908, 919 (Tenn. 1994); State v. Brimmer, 876 S.W.2d 75, 82 (Tenn. 1994). Since, however, the amendments to the statute create a higher burden of proof, and thus inure to the benefit of the appellant, we believe any error committed by the trial judge was merely harmless. See, e.g., State v. Thompson, No. 03C01-9406-CR-00198, Dickson County (Tenn. Crim. App. Jan. 24, 1996), perm. app. denied, concurring in results only, (Tenn. 1996).

In the recent case of Odom, the jury sentenced the appellant to death upon a finding of the heinous, atrocious, or cruel aggravator, among others, for the conviction of murder during the perpetration of rape. Odom, 928 S.W.2d at 20-21. The elderly victim was accosted in her car by the appellant, raped, and stabbed several times in the heart, lung, and liver. Odom, 928 S.W.2d at 22. She died as a result of internal bleeding which occurred from the stab wounds. Id. In ruling that the evidence was not sufficient to support the finding of the especially heinous, atrocious, or cruel aggravator, the Supreme Court held that "rape (penile penetration) does not ordinarily constitute 'torture' or 'serious physical abuse' within the meaning of [this aggravating circumstance]." Odom, 928 S.W.2d at 26 (emphasis added). The Court further noted that the stab wounds did not evidence torture or serious physical abuse beyond that necessary to produce death. Id.

As the State asserts, Mrs. Smith suffered mental torture when she was forcibly removed from her bed while screaming in the middle of the night, hidden in a closet while her husband was dead or dying, and subsequently raped. The evidence, though not directly showing that Mrs. Smith knew the exact fate of her spouse, supports the strong assumption that she heard what was happening and knew her husband was in dire circumstances. The video shown to the jury clearly depicts that a profound struggle occurred between the assailants and Mr. Smith; the bed covers were strewn about the room, Mr. Smith was kneeling against the bed, fingernail scratch marks were found on his neck, and the bed frame was broken away from the headboard and the mattress was lying on the floor. In his statement to the police, the appellant said that as Patterson left the master bedroom after killing Mr. Smith, he grabbed Mrs. Smith as she was coming back down the hallway. The jury could easily have concluded that she was going to check on her husband after she heard

the struggle.

It clearly appears from the record that the strangulation occurred after the rapes and while the victim was conscious. Even though Odom states that rape does not ordinarily constitute torture or serious physical abuse, we find that the facts of the case sub judice more distinctly demonstrate their existence. In Odom, the victim was raped once. Here, the victim was raped twice, and by two different individuals. Moreover, the rapes were not committed upon the initial criminal confrontation. In Odom, the rape ensued almost immediately after the victim was accosted. Mrs. Smith was not raped until after she was placed in a closet where she apparently heard the attack on her husband. And after the rapes occurred, the assailants *further* tortured and ridiculed Mrs. Smith by pouring two bottles of wine coolers over her naked body.

Mrs. Smith remained conscious for at least thirty seconds while she was being strangled after she had been twice raped. The abrasions on her neck indicate that she tried, unsuccessfully, to release the pressure from around her neck. Although Dr. Harlan testified that he was uncertain from the medical evidence whether a break occurred in the strangulation process, other testimony suggests that when the initial attempt to strangle proved futile, an apparent second, more successful, attempt to strangle Mrs. Smith was made using a tourniquet device. As Joseph Denning testified, the appellant told him he made the first attempt to strangle Mrs. Smith. According to Denning's testimony, the appellant lacked the strength to kill her, so Patterson had to complete the act using the vase in the scarf. The abrasions on Mrs. Smith's neck indicate that she was conscious during a portion of the struggle. It appears from the record that Mrs. Smith was forced to endure not only the severe

physical pain of the strangulation, but the grueling mental pain as well of not knowing when and if the assailants would continue what probably appeared to her as repeated acts of strangulation and torture.

Case law states that a strangulation, in and of itself, is not sufficient to establish the heinous, atrocious, or cruel aggravating circumstance. See Hodges, slip op. at 15. Nor does a rape, standing alone, satisfy this aggravator. See Odom, 928 S.W.2d at 26. However, we believe that the strangulation, combined with the two rapes and the evidence surrounding this entire criminal episode, does support the jury's finding of the especially heinous, atrocious, or cruel aggravating circumstance in this case.

We believe our conclusion is further buttressed by another distinction between this case and Odom. In Odom, the appellant was convicted of felony murder in the perpetration of rape. The appellant in the present case was convicted of felony murder in the perpetration of first degree burglary. The Court in Odom, holding that a rape does not ordinarily constitute torture, stated that to hold otherwise would permit every murder committed in the perpetration of a rape to be automatically classified as a death-eligible offense. In essence, another Middlebrooks-type duplication problem would ensue. Accordingly, the Court's reasoning suggests that its statement about rape was necessitated because the appellant stood convicted of felony murder in the perpetration of a rape. Because the appellant before us was not convicted of murder in the perpetration of a rape, we are satisfied that our holding does not create the constitutional infraction intimated by the Supreme Court.

(2). The appellant claims that because the testimony demonstrates that

-21-

Patterson actually killed Mrs. Smith, there is insufficient evidence to sustain the jury's finding of the especially heinous, atrocious, or cruel aggravator. The Supreme Court, in State v. Branam, 855 S.W.2d 563, 570 (Tenn. 1993), outlined the controlling law addressing the appellant's claim:

> In Edmund v. Florida, 458 U.S. 782, 789, 102 S.Ct. 3368, 3372, 73 L.Ed.2d 1140 (1982), the United States Supreme Court held that death is a disproportionate penalty and, therefore, constitutes cruel and unusual punishment under the Eighth Amendment, where it is imposed against a defendant "solely for participation in a robbery in which another robber takes life," without proof that the defendant himself attempted or intended to kill, or intended that lethal force be used. This constitutional standard was refined by the Court in Tison v. Arizona, 481 U.S. 137, 158, 107 S.Ct. 1676, 1688, 95 L.Ed.2d 127 (1987), in which it was held that the Eighth Amendment does not prohibit the death penalty in the case of a defendant whose participation in a felony that results in murder is major and whose mental state at the time is one of reckless indifference to the value of human life -- even though the proof fails to show intent to kill.

See also T.C.A. § 39-11-407 ("it is no defense that . . . (2) The person for whose conduct the defendant is criminally responsible has been acquitted, has not been prosecuted or convicted, has been convicted of a different offense or different type or class of offense, or is immune from prosecution.")

Even though there is some testimony which suggests that Patterson was the one who ultimately strangled Mrs. Smith to death, the testimony also shows that the appellant attempted to strangle the victim but simply did not have enough strength to bring the task to the intended conclusion. This does not substantially reduce his culpability. Thus the appellant's claim in this respect must fail.

## CONSTITUTIONALITY OF THE ESPECIALLY HEINOUS, ATROCIOUS, OR CRUEL AGGRAVATOR

Next, the appellant contends that the language of the aggravating circumstance found in Tennessee Code Annotated section 39-13-204(i)(5) is too vague to satisfy constitutional standards. This aggravating circumstance can be imposed in the death penalty context if the jury determines beyond a reasonable

doubt that "[t]he murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death." Id. Furthermore, the appellant claims the definitions of the terms in the statute given by the trial court are themselves too vague as well. The Supreme Court recently addressed this issue in Odom. The Court upheld the validity of the aggravating circumstance under constitutional attacks. See Odom, 928 S.W.2d at 25-26. Accordingly, the appellant's issue is without merit.

## SENTENCE OF LIFE WITHOUT POSSIBILITY OF PAROLE

The appellant also argues that the trial court should have instructed the jury it could consider life without the possibility of parole as an alternative sentence. The appellant relies upon Tennessee Code Annotated sections 39-13-204(k) and 39-11-112 in support of his argument. The State contends that because the offenses in this case were committed prior to the amendment providing life without the possibility of parole, the appellant was properly sentenced under the old language. Moreover, the State asserts the appellant should be prevented from raising this issue on appeal when he requested the trial court not to inform the jury of the new sentencing option.

Section 39-13-204(k) was amended in 1993, and that amendment provides in pertinent part:

> If the trial court, or any other court with jurisdiction to do so, orders that a defendant convicted of first degree murder (whether the sentence is death, imprisonment for life without the possibility of parole or imprisonment for life) be granted a new trial, either as to guilt or punishment or both, the new trial shall include the possible punishments of death, imprisonment for life without the possibility of parole or imprisonment for life.

See also § 39-13-202(c) (1993) (creating penalty of life without possibility of parole). According to the appellant, because he was granted a new sentencing hearing, this

section of the code states that he shall receive the benefit of an instruction on life without the possibility of parole. The State, on the other hand, argues that section 16 of chapter 473 of the Public Acts of 1993 provides that this new sentencing option shall only apply to offenses committed on or after July 1, 1993. According to the State, since the offenses in this case occurred in 1987, the trial court was not authorized under this section of the code to instruct the jury on life without the possibility of parole as an available sentence.

Alternatively, the appellant cites to Tennessee Code Annotated section 39-11-112 as authority in support of his argument. This section states:

> Whenever any penal statute or penal legislative act of the state is repealed or amended by a subsequent legislative act, any offense, as defined by the statute or act being repealed or amended, committed while such statute or act was in full force and effect shall be prosecuted under the act or statute in effect at the time of the commission of the offense. Except as provided under the provisions of § 40-35-117, in the

event the subsequent act provides for a lesser penalty, any punishment imposed shall be in accordance with the subsequent act.[4]

The appellant argues that because the 1993 amendments to the death penalty statute provide for the sentencing alternative of life without the possibility of parole, which could arguably be considered a lesser penalty, the trial judge should have instructed the jury on this option as mandated by the above-quoted statute.

Contrary to the appellant's claim, however, we are convinced that the trial judge ruled correctly in this case. As this Court announced in State ex. rel. Stewart v. McWherter, 857 S.W.2d 875, 877 (Tenn. Crim. App. 1992), perm. to appeal denied, id., (Tenn. 1993), "[t]he criminal savings statute [§ 39-11-112] has never been interpreted to apply to convictions and sentences which were already received when a subsequent act or amendment provided for a lesser penalty." Furthermore, the effective date section of the life without parole act mandates that the entire new act, not solely subsection (k) dealing with new trials, shall apply only to offenses committed after July 1, 1993. Furthermore, the Supreme Court in this case ordered the new sentencing hearing in 1989, well before the amendments creating life without the possibility of parole were enacted. Given the precise language of the act, we do not believe the legislature intended for the new sentencing option to encompass those crimes committed before July 1, 1993. Accordingly, this issue is without merit.

## PROSECUTORIAL MISCONDUCT

---

[4] § 40-35-117 outlines the applicable dates of the Criminal Sentencing Reform Act of 1989. For example, an offense committed prior to July 1, 1982 shall be prosecuted under the prior law, regardless of sentencing considerations.

The appellant claims the death penalty should be reversed because certain remarks made by the prosecutor during closing arguments violated his constitutional rights. Specifically, the appellant contends the prosecutor engaged in inappropriate name-calling, and improperly encouraged the jury to "do its duty" for the sake of deterrence. The State argues that the remarks were in response to the appellant's argument and were in accordance with the court's instructions on the law. Even if the statements were inappropriate, the State asserts that they were rather brief and of little significance, and therefore any error was harmless.

As is commonly recognized, closing arguments are an important tool for the parties during the trial process. Consequently, the attorneys are usually given wide latitude in the scope of their arguments, see State v. Bigbee, 885 S.W.2d 797, 809 (Tenn. 1994), and trial judges in turn are accorded wide discretion in their control of those arguments, see State v. Zirkle, 910 S.W.2d 874, 888 (Tenn. Crim. App.), perm. to appeal denied, id., (Tenn. 1995). Such scope and discretion, however, is not completely unfettered. The test for determining whether the prosecuting attorney committed reversible misconduct in the argument is "whether the improper conduct could have affected the verdict to the prejudice of the defendant." Harrington v. State, 385 S.W.2d 758, 759 (Tenn. 1965). The following factors have been recognized to aid the Court in this determination: 1) the conduct complained of, viewed in light of the facts and circumstances of the case; 2) the curative measures undertaken by the court and the prosecutor; 3) the intent of the prosecutor in making the improper statement; 4) the cumulative effect of the improper conduct and any other errors in the record; and 5) the relative strength or weakness of the case. State v. Buck, 670 S.W.2d 600, 609 (Tenn. 1984); Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976).

The following is a recitation of the relevant portion of the State's rebuttal argument at issue here:

Yes, we are asking for the death penalty. Why? Why should Ronnie Cauthern die? I once heard an interpretation of the Lord's Prayer. "Deliver us from evil," originally translated and actually read, "Deliver us from the evil one" -- far more personally, far more graphic, and far more intense -- the evil one.

In the 1960's, the Rolling Stones came out with a song. The refrain after each chorus was, "Pleased to meet you. Hope you guess my name." And, I suggest to you it was a song about the evil one appearing in person throughout the ages in many different guises. Mr. Poland says civilized society -- in civilized society, we don't kill. But in civilized society, we must address -- we must stand up to, we must confront the realities of our daily existence and our daily survival not only of ourselves but of our children and their children.

It came to dawn on me after I thought about, "Pleased to meet you, hope you guess my name" -- that on January 8th and January 9th, 1987, the evil one descended upon Patrick and Rosemary Smith, and the evil one is smart, the evil one is skilled, the evil one is wily, and the evil one is manipulative. A simple little demonstration of that, ladies and gentlemen, is this. The evil one appeared today and produced greeting cards -- "Merry Christmas," "Happy Holidays."

But on January the 8th, 1987, the evil one appeared at the door of 351 Hampshire Drive, a home not unlike yours in a neighborhood not unlike yours --the evil one appeared there in disguise --a mask, a black jacket, a pistol, strangling rope, and the evil one is capable of taking advantage of what was available inside their house.

Yes, whether you like it or not --whether you volunteered or not, you were engaged in the ultimate battle in everyday combat with the evil one, and he's not going to go away. He appeared in Minnesota in the form of Jeffrey Dahlmer[sic]. He appeared in Union, South Carolina, and on January the 9th, he appeared in the door of Patrick and Rosemary Smith. You cannot negotiate with the evil one, ladies and gentlemen. You cannot deal in good faith with the evil one. You

have got to destroy and destroy, or he and his benefactors will destroy you. He'll destroy us. He'll destroy our children.

The evil one took the name of Ronnie Cauthern on that day. That was his name, and he's beyond redemption. He's beyond rehabilitation. There is no treatment for this individual posing in a mask and taking human form. There is no treatment for this person. This person has been around through the ages and will appear again. You cannot cure him. Don't try to save him. Engage him in combat and destroy him. Do your duty. When you open that paper and you find that the State has carried out your instruction, you will have scaled the ramparts at least one time, and you will have been a part of bringing back peace and tranquility in your community and in our community, and you will send a message to the evil one. You will send a message that we stand ready --armed, and ready to fight for all in the world, for everything that you believe in, for the sanctity of your home, the blessing of seeing your children reach adulthood and have your grandchildren, and you will take that step and leave a legacy to your children that they someday will not have to grapple with what the Smiths had to deal with and what Karen Rivetna and her mother have to deal with.

"Holiday Greetings" --a time for loved ones to get together. Horrible chaos has been reaped and racked on this family. I'm asking you to do your duty. Stand tall. Thank you.

The appellant contends that references to him as the "evil one" were highly inappropriate. The appellant further argues he was prejudiced when the prosecutor compared him to the devil, Jeffrey Dahmer, and Susan Smith. Closing arguments must be temperate, must be based upon evidence introduced during trial, and must be pertinent to the issues being tried. Coker v. State, 911 S.W.2d 357, 368 (Tenn. Crim. App.), perm. to appeal denied, id., (Tenn. 1995); State v. Tyson, 603 S.W.2d 748, 754 (Tenn. Crim. App. 1980). Remarks during argument comparing the appellant to other people and biblical figures are irrelevant and patently improper. See State v. Bates, 804 S.W.2d 868, 881 (Tenn. 1991). Moreover, it appears to be well established in Tennessee that references to biblical passages or religious law

-28-

during a criminal trial are also inappropriate.  See State v. Stephenson, 878 S.W.2d 530, 541 (Tenn. 1994); Kirkendoll v. State, 281 S.W.2d 243, 254 (Tenn. 1955).

As the appellant suggests, the predominate theme in the State's final argument appears not only to be couched in terms of religion, but also appeals to deterrence.  While the federal constitution does not preclude the sentencing jury in a capital case from considering the future dangerousness of a particular appellant where such is a relevant factor under the sentencing statute, see Spaziano v. Florida, 468 U.S. 447, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984); California v. Ramos, 463 U.S. 992, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983); Jurek v. Texas, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976), Tennessee courts have held that general deterrence is not an appropriate argument during sentencing, see State v. Irick, 762 S.W.2d 121, 131 (Tenn. 1988).  See also State v. Bates, 804 S.W.2d 868, 882 (Tenn. 1991).  An argument based upon deterrence is usually considered irrelevant and unrelated to any mitigating or aggravating circumstance, unless the argument relates to either the State's or appellant's theory of the case.  Bates, 804 S.W.2d at 882.  As this Court has held, however, "the prosecutor [does] not engage in misconduct by commenting that the jury [is] 'the voice for this community.'" State v. Dalton, No. 02C01-9408-CR-00291, Davidson County, slip op. at 3 (Tenn. Crim. App., July 11, 1995).  The State "must [nonetheless] refrain from argument designed to inflame the jury." Coker v. State, 911 S.W.2d 357, 368 (Tenn. Crim. App. 1995). See also State v. Zirkle, 910 S.W.2d 874, 888 (Tenn. Crim. App. 1995) (citing Harrington v. State, 385 S.W.2d 758 (Tenn. 1965)).

The State argues that the comments were made in rebuttal to the appellant's statement that a civilized society does not kill. The State also claims that its reference to the evil one was in accordance with the court's definition of "atrocious: extremely evil or cruel." According to the State, the prosecutor was simply trying to satisfy the aggravating circumstance.

The prosecutor intended obviously to impress upon the jury that the appellant is an evil person who deserves the death penalty. The State's position in the trial, however, was obvious as well when it filed notice of intent to seek the death penalty. The prosecutor told the jury to do its duty. This is arguably no different than the prosecutor asking the jury to return a guilty verdict. Accordingly, it appears to us that the prosecutor was simply reiterating the State's position that the nature of the crimes warranted an extreme punishment. Of course, references to the evil one, the devil and other notorious criminals are not relevant to the facts and circumstances of this case and are thus improper. Insinuations regarding deterrence are also improper. The appellant, however, did not object to this line of argument and the court thus took no curative measures.[5]

After examining the above-quoted remarks in light of the entire closing argument, the facts and circumstances surrounding the case, and the overall strength of the State's case, however, we cannot say that the improper comments

---

[5] Earlier in this prosecutor's argument, however, the appellant did voice an objection. The prosecutor made several statements concerning the circumstances of the crime, which the appellant claimed were outside the scope of his remarks in closing and thus not proper matters for rebuttal. The prosecutor stated he would make his argument relevant to appellant's remarks, and the court allowed him to proceed.

made during the State's rebuttal argument affected the verdict to the prejudice of the appellant. Accordingly, this issue is without merit.

## ADMISSION OF THE VIDEOTAPE

The appellant claims that the trial judge abused his discretion by allowing into evidence a videotape depicting the crime scene. Specifically, the appellant argues that those segments of the tape showing the officers turning the bodies over onto their backs in order to obtain an anterior view were highly inflammatory and irrelevant. The appellant places great weight upon the fact that the original trial judge redacted from the jury's view during the guilt phase of the trial those scenes depicting the moving of the bodies. In response, the State argues that the video was relevant to show the heinous, atrocious, or cruel nature of the crime.

The admissibility of relevant videotapes of the crime scene and victims has long been within the sound discretion of the trial judge, and his or her ruling on admissibility will not be disturbed on appeal absent a clear showing of an abuse of that discretion. State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978). See also, State v. Bigbee, 885 S.W.2d 797, 807 (Tenn. 1994); State v. Van Tran, 864 S.W.2d 465, 477 (Tenn. 1993). Moreover, the recent trend is to vest more discretion in the trial judge's rulings on admissibility. See Banks, 564 S.W.2d at 949; State v. Bailey, No. 01C01-9403-CC-00105, Dickson County (Tenn. Crim. App., Nashville, July 20, 1995); perm. to appeal denied, id., (Tenn. 1996).

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. However,

relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Tenn. R. Evid. 403. Along these lines, the trial court should be guided by the following matters in determining the admissibility of relevant videotape evidence: the accuracy and clarity of the video and its value as evidence; whether the video depicts the body as it was found; the adequacy of testimonial evidence in relating the facts to the jury; and the need for the evidence to establish a *prima facie* case of guilt or to rebut the defendant's contentions. Banks, 564 S.W.2d at 951.

Prior to the sentencing hearing on remand, the trial judge heard arguments regarding the admission of the videotape and ruled that the probative value of the evidence in regards to the aggravating factor outweighed any unfair prejudicial effect. The court also ordered that the sound be turned off so as to avoid any improper influence from the comments of the officers. See State v. Van Tran, 864 S.W.2d 465, 477 (Tenn. 1993). The segments of the videotape at issue in this appeal deal with the camera shots of the victims. Those portions showing the general layout of the house and the evidence of the burglary, while arguably irrelevant for purposes of sentencing, are not at issue.

Both victims were found lying face down. Mr. Smith's body was wrapped in the covers kneeling against and on the bed, and Mrs. Smith's body was nude on the floor. The video shows close-ups of both victims as they were found. The video then shows the officers removing the covers from around Mr. Smith's body, turning his body onto his back, and examining his neck, arms and legs. The video zooms in on the wounds around his neck and face. Likewise, the video shows the officers removing the scarf from around Mrs. Smith's neck and flipping her body over. Again,

the video zooms in on the wounds around her neck and face.

Both bodies exhibit a bluish tint to the skin and lips, as well as the effects of lividity and rigor mortis. While the appellant may be correct to argue that these postmortem features are irrelevant to any aspect of the heinous, atrocious, or cruel aggravator, the nature of the various wounds to the neck do appear relevant. Each victim was strangled with a different object, and thus received different types of strangulation marks around the neck. Moreover, as the expert testimony demonstrated, the pictures of what are probably fingernail scratches indicate that the victims attempted to free the pressure from around their necks. Because of the position in which the victims were found, it was necessary for the officers to turn the bodies over to examine the wounds to the neck. As the forensic pathologist stated, the bluish color of the skin, i.e. cyanosis, is a natural consequence of this type of killing. The stiffness of the bodies resulting from the rigor mortis is also common after death, and not in and of itself so inflammatory. See State v. Bigbee, 885 S.W.2d 797, 807 (Tenn. 1994). As the trial court noted, though the condition of the bodies is not pleasant by any means, it is "not so gruesome as to . . . shock the conscience of the Court or of the jury."

We believe the videos were relevant to the jury's determination of whether the murders were especially heinous, atrocious or cruel. We conclude that the probative value of the videotape outweighs any unfair prejudicial effect, and the trial judge therefore acted appropriately. Contrary to the appellant's argument, the fact that the judge on remand allowed more of the video to be shown than did the original trial judge is irrelevant to this Court's inquiry into the issue. The original judge's ruling was based in part on showing the video during the guilt phase of the trial rather than

the sentencing phase.  This issue is without merit.

## EVIDENCE OF UNRELATED CRIMES

The appellant also argues that reversible error occurred when the State introduced evidence concerning a different robbery for which the appellant had been tried and acquitted.  In response, the State argues the appellant has waived the issue because he permitted the introduction of the evidence and denied the court's offer of a curative instruction.

The appellant was originally indicted on eight counts in this case.  Three of those charges pertained to crimes unrelated to the incident at the Smiths' residence, and they were severed from the indictment.  The appellant was subsequently tried and acquitted on those three counts.  Prior to the resentencing hearing, the trial judge granted the appellant's motion to keep the separate charges from the jury and warned the State that a mistrial could follow if evidence of them surfaced.

During the State's proof in the hearing, the State asked Detective Charles Denton to read one of the appellant's statements into evidence.  This statement was obtained during the first interview with the appellant on January 12, 1987.  The appellant objected to the introduction of this statement because it was not a verbatim recording of the conversation between the officer and the appellant, but rather consisted of Detective Denton's annotations from the interview. The court overruled the objection and allowed the jury to review copies of the statement while the officer read it aloud on the stand.  The following question and answer appear in this statement: "Question - Do you know who committed the armed robbery at the Hornbuckle 66?  Answer - No."  This reference was to one of the three charges on

which the appellant was acquitted. After this portion of the statement was read, the appellant voiced another objection. The court informed the witness not to read one further question in the statement pertaining to the Hornbuckle robbery. The appellant, however, moved for a mistrial because the jury was in fact reading along with the officer and could see the next question: "Question - Do you know if Joe commit [sic] the burglary - robbery with Pat? Answer - I think so." The court overruled the motion for mistrial, and the following exchange occurred: "Court - What instruction do you suggest I give? . . . [Appellant's counsel] - We'll just stand on the Motion for Mistrial."

This situation is quite similar to that in State v. Smith, 893 S.W.2d 908 (Tenn. 1994). In Smith, one of the State's witnesses made reference to the defendant's prior jail time. The defendant moved for a mistrial, which the court denied. The court, however, gave the jury a curative instruction to disregard the statement and not to consider it for any purpose. Id. at 923. The Supreme Court held that it must assume the jury followed the trial court's instruction. Id. Moreover, the Court noted that given the record as a whole in that capital case, the statement, though improper, could not have prejudicially affected the jury. Id. (citing T.R.A.P. 36(b)). Likewise, in State v. Harris, 839 S.W.2d 54, 72 (Tenn. 1992) (citing T.R.A.P. 36(b)), the Supreme Court, in considering the effect of statements concerning prior criminal activity on the jury's verdict in a capital case, stated that the admission of the evidence was harmless beyond a reasonable doubt when viewed in context of the entire record. See also State v. Baker, 751 S.W.2d 154, 164 (Tenn. Crim. App. 1987); State v. Lawson, 695 S.W.2d 202, 204 (Tenn. Crim. App. 1985).

The decisions in the above-cited cases were based in part upon the appellate

court's assumption that the jury obeyed the trial court's curative instruction pertaining to the inadmissible evidence. In the case at hand, the trial court gave no curative instruction. However, as the State notes, the appellant refused to entertain the trial court's offer to give such an instruction. The decisions in the above-cited opinions also relied upon the rationale of T.R.A.P. 36(b): "A final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process." The first part of that same rule states, in pertinent part, that "Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error." T.R.A.P. 36(a).

Accordingly, although the trial court seemed willing to entertain a request for an instruction, the appellant refused to recommend an instruction and decided instead to stand on his motion for mistrial. The record indicates that the appellant also had an opportunity to review the statement before it was introduced, and did not object to the improper references.[6] We believe Rule 36(a) controls our decision here. Moreover, considering the whole record as mandated by 36(b), we find the error to be harmless beyond a reasonable doubt. The improper statements were brief, and given the context in which they were made, added no "'new dimension to the jurors' view of [the appellant]'". State v. Harris, 839 S.W.2d 54, 72 (Tenn. 1992) (quoting State v. Carter, 714 S.W.2d 241, 247-48 (Tenn. 1986)). The statements do not associate the appellant with any other criminal activity or legal proceedings.

---

[6] The appellant objected to the introduction of the statement, but his objection was grounded upon something other than the reference to the prior acquittal; he objected because the statement was not an exact transcript of the interview which was conducted.

Furthermore, before the hearing, the trial judge stated that a mistrial could be warranted if any improper evidence concerning the prior acquittals were introduced. Since he overruled the appellant's motion, the judge must have been satisfied that no prejudice resulted from these improper statements. We agree. This issue, therefore, is without merit.

## ADMISSION OF TRANSCRIPT OF RECORDED STATEMENT

Next, the appellant contends it was reversible error for the trial court to allow a transcript of a tape-recorded statement into evidence when the State was unable to produce the original recording. The State argues that the original has been lost and that the transcript was properly admitted under the exception to the best evidence rule.

The evidence at issue here consists of a transcript of a tape-recorded interview between the appellant and Detectives Denton and Griffy. On the initial direct appeal of this case, the Supreme Court reversed the death penalty based upon the improper introduction of a portion of the interview. In accordance with the Supreme Court's opinion, that portion of the statement was not introduced during the hearing on remand. On remand, a redacted transcript was read into evidence which omitted any mention of Brett Patterson. As part of his complaint, the appellant argues that he was "forced into the untenable position" of subsequently having to introduce the unredacted portions of the statement which referred to Patterson's involvement.

Prior to the introduction of the transcript into evidence, there was some discussion among the parties and the judge concerning the whereabouts of the

original taped recording. Apparently, the tape was lost or misplaced by the Supreme Court sometime during the prior proceedings. The trial judge made the following ruling:

> All right. And, the Tennessee Supreme Court's already seen it. It's been authenticated by the Trial Court in Montgomery County and the Tennessee Supreme Court. I'm going to let them read that portion which the Supreme Court said was admissible . . . As an officer of the Court, I'm saying that [the state] properly has this transcribed from the original tapes, and over your objection and after noting your exception, I'm going to allow its admission . . . It's just that the tape is now gone and has been lost by the Tennessee Supreme Court . . . and I'm assuming that this transcript . . . is proper.

According to the record before the Court, the transcript of the recorded interview was authenticated and introduced during the original trial of this case. See also State v. Cauthern, 778 S.W.2d 39, 41 (Tenn. 1989). During that trial, the trial judge ordered the State to redact those portions of the statement that referred to Patterson before the statement was introduced. Moreover, the trial judge on remand acknowledged the fact that the taped recording has been lost. Rule 1004 of the Tennessee Rules of Evidence provides that other evidence of the original recording is admissible if the original has been lost or destroyed. Accordingly, the introduction of the transcript was proper.

Neither is there any merit to the appellant's claim that he was prejudiced by the introduction of both the redacted and unredacted transcripts. The appellant seems to suggest that the evidence of the redacted statement placed undue emphasis on his involvement in the crimes. The trial judge, however, allowed the witness to take the stand again and read the unredacted portions into evidence. Any harm caused by the redacted statement, therefore, was cured by the additional evidence. Accordingly, this issue is without merit.

-38-

## NONSTATUTORY MITIGATING CIRCUMSTANCES

The appellant claims the trial judge should have instructed the jury it could consider as mitigating factors the fact that the appellant's co-defendant received a life sentence, and that the appellant has been a model prisoner and has helped others inside and outside the prison. The State argues that neither the state nor federal constitution require the judge to instruct the jury on nonstatutory mitigating circumstances.

The trial judge instructed the jury concerning the following statutory mitigating circumstances: 1) the appellant has no significant criminal history; 2) the murder was committed while the appellant was under the influence of extreme mental or emotional disturbance; 3) the youth of the appellant at the time of the crime; 4) the capacity of the appellant to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was substantially impaired as a result of mental disease or defect or intoxication which was insufficient to establish a defense as a matter of law but which substantially affected his judgment through the ingestion of drugs; and 5) any other mitigating evidence which is raised by the evidence. The judge also instructed the jury on the following nonstatutory circumstances: 1) the appellant was an enterprising young man at the time of the crime; 2) the appellant has a minor child; and 3) the appellant is married. The trial judge refused, however, to instruct the jury that Patterson received a life sentence, the appellant has been a model prisoner, and the appellant has helped others while in prison.

In State v. Odom, the Supreme Court recently addressed the issue of instructions on nonstatutory mitigators under the death penalty statute as amended

in 1989. Although the Court recognized that the trial court is not constitutionally mandated to instruct the jury on nonstatutory mitigating factors, the Court did construe the 1989 amendments, see Tenn. Code Ann. § 39-13-204(e)(1) (Supp. 1995), to require the judge to give the jury specifically requested instructions on mitigating circumstances that are raised by the evidence. See Odom, 928 S.W.2d at 29-30. In its discussion, however, the Court also acknowledged that under the law as it previously existed, see § 39-13-203(e) (1982), there was no statutory provision requiring the trial court to instruct the jury specifically on nonstatutory mitigators:

> [T]he only mandatory instructions with respect to mitigating circumstances are that those statutory circumstances which are raised by the evidence shall be expressly charged, and the jury must be told that they shall weigh and consider any other facts or circumstances that are raised by the evidence that they find to be mitigating circumstances, in making the determination of which circumstances, aggravating or mitigating, outweigh the other.

Odom, 928 S.W.2d at 29 (quoting State v. Hartman, 703 S.W.2d 106, 118 (Tenn. 1985)). See also State v. Cazes, 875 S.W.2d 253, 268 (Tenn. 1994); State v. Smith, 857 S.W.2d 1, 15 (Tenn. 1993); State v. Wright, 756 S.W.2d 669, 674 (Tenn. 1988); State v. King, 718 S.W.2d 241, 249 (Tenn. 1986).

The trial judge in this case instructed the jury on the law governing mitigating circumstances as amended in 1989. See Tenn. Code Ann. § 39-13-204(e)(1) (Supp. 1995).[7] The judge also instructed the jury on three specific nonstatutory mitigating factors. As discussed previously, the general provisions of § 39-11-112 and the principles against retroactive application of statutes mandate that an offense committed under a repealed or amended law shall be prosecuted under that law,

_____

[7] Prior to the 1989 amendments, the trial court was not required to inform the jury that no distinction shall be made between statutory and specifically requested nonstatutory mitigating factors. See § 39-13-203(e) (1982). The judge here instructed the jury not to distinguish between the two types of factors. See § 39-13-204(e)(1) (Supp. 1995.).

unless the new law provides for a lesser penalty. See State v. Smith, 893 S.W.2d 908, 919 (Tenn. 1994); State v. Brimmer, 876 S.W.2d 75, 82 (Tenn. 1994). The amendments to those sections of the death penalty statute addressing mitigating circumstances, however, do not pertain to lesser penalties.

Accordingly, the trial judge was not compelled to instruct the jury on specific nonstatutory mitigating factors, and should have instructed the jury under the law as it existed at the time of the commission of the offense. However, because the instructions on the several nonstatutory mitigating circumstances inured to the benefit of the appellant, any errors in the trial court's actions were harmless. See supra note 3. Furthermore, because the prior law did not require the judge to instruct on nonstatutory mitigating circumstances, the trial judge's refusal to instruct on the requested mitigating factors at issue here was proper. This issue, therefore, is without merit.

## EXCLUSION OF EVIDENCE INTRODUCED AS MITIGATION

The appellant also argues that the trial judge erred by refusing to allow into evidence as mitigation a letter the appellant received from his son. The State contends the trial judge did not abuse his discretion and that the letter was not evidence of mitigation.

In the letter at issue, the appellant's son writes how he loves his father and that he hopes to see him again soon. The letter also describes some of the son's recent activities. The State objected to its introduction on the grounds that it was not probative of any issue and was redundant of testimony already introduced. The trial court sustained the objection. On appeal, the appellant simply asserts that the letter

is evidence of mitigation that should have been before the jury. The State, in response, claims that the letter adds nothing to the evidence of the appellant's son which was already before the jury.

In State v. Odom, the Supreme Court reviewed the principles governing mitigating evidence. While the particular facts of each case will govern the determination of mitigating circumstances, evidence relating to the appellant's character or background is considered relevant and admissible as mitigation. Odom, 928 S.W.2d at 31 (citing Boyde v. California, 494 U.S. 370, 382 (1990); Penry v. Lynaugh, 492 U.S. 302, 319 (1989)). Conversely, evidence that does not pertain to the appellant's character or background is not relevant and *may* be excluded by the trial judge. Id. (citing Delo v. Lashey, 507 U.S. 272 (1993); Lockett v. Ohio, 438 U.S. 586, 605 n.12 (1978)).

In the case at hand, the trial judge allowed the appellant to testify that he had a son and that he received a visit from him every three or four months. The introduction of the letter itself, however, does not depict anything additional about the appellant's character. The jury was already aware that the appellant had a minor child, and the trial judge even instructed this fact as a mitigating circumstance. We believe the letter is cumulative evidence which was properly excluded. "It is well established in Tennessee that the decision to admit or exclude evidence is left to the sound discretion of the trial judge and the judge's decision will not be disturbed unless it has been arbitrarily exercised." State v. Davis, 872 S.W.2d 950, 955 (Tenn. Crim. App.), perm. to appeal denied, id., (Tenn. 1993) (citing State v. Baker, 785 S.W.2d 132, 134 (Tenn. Crim. App. 1989); State v. Hawk, 688 S.W.2d 467, 472 (Tenn. Crim. App. 1985)). See also State v. Smith, 857 S.W.2d 1, 17 (Tenn. 1993)

(citing <u>Lockett v. Ohio</u>, 438 U.S. 586, 604, n.12, 98 S.Ct. 2954, 2965 n.12, 57 L.Ed.2d 973 (1978); <u>State v. Johnson</u>, 632 S.W.2d 542, 548 (Tenn. 1982)) ("Under either the constitution or the [death penalty] statute, however, the court retains its traditional authority to exclude irrelevant evidence [in a capital sentencing hearing].") Accordingly, because the trial judge did not abuse his discretion or improperly keep any mitigating evidence from the jury, this issue is without merit.

## COMPETENCY OF JUROR FOREPERSON

The appellant next contends that the juror foreperson's inability to read the verdict form without the assistance of the trial judge effectively denied him the right to an impartial jury. Specifically, the appellant suggests that since the foreperson had difficulty reading the verdict form aloud in open court, she probably encountered difficulty understanding the legal instructions contained in the written charges. The State contends that although the foreperson experienced some trouble reading the verdict form, there is no evidence in the record which indicates she could not understand the spoken word of the oral charges given by the judge.

The trial judge read the charges to the jury in open court before allowing them to retire. Once the jury returned from their deliberations, the following exchange ensued:

THE COURT: All right. I'm going to ask you to read that for me if you
will. With regard to the first count of the indictment which alleges the
murder of Patrick Smith, what is your verdict?
MS. VALERIE CLARK: Life imprisonment. We, the jury --
THE COURT: Will you read it -- read that for me?
MS. CLARK: We, the jury -- okay -- what's that?
THE COURT: Unanimously.
MS. CLARK: Unanimously determine that one --
THE COURT: Statutory.
MS. CLARK: Statutory.

-43-

THE COURT: Aggravating.

MS. CLARK: Aggravating --

THE COURT: Circumstances.

MS. CLARK: Circumstances has been proven by the State beyond a reasonable doubt. We, the jury, therefore, find the sentence shall be imprisonment for life.

THE COURT: And, you've each affixed your name to that. Is that right?

MS. CLARK: Right.

THE COURT: With regard to the second count of the indictment which alleges the death of Rosemary Smith, what is your verdict?

MS. CLARK: Punishment of death.

THE COURT: Will you read that for me, please?

MS. CLARK: We, the jury --

THE COURT: Unanimously.

MS. CLARK: Unanimously find that the following list --
listing --

THE COURT: Statutory.

MS. CLARK: Statutory.

THE COURT: Aggravating.

MS. CLARK: Aggravating.

THE COURT: Circumstances.

MS. CLARK: Circumstances of --

THE COURT: Do you want to list this for me? Can you read that, please?

MS. CLARK: The murder was especially human --

THE COURT: Heinous.

MS. CLARK: -- heinous --

THE COURT: Atrocious.

MS. CLARK: -- atrocious, and cruel, in that is involved --

THE COURT: Torture.

MS. CLARK: -- torture --

THE COURT: Or serious --

MS. CLARK: -- or serious physical abuse beyond that necessary to prove --

THE COURT: -- produce death.

MS. CLARK: -- produce death.

THE COURT: All right. Will you continue to read?

MS. CLARK: We, the jury --

THE COURT: Unanimously.

MS. CLARK: -- unanimously find that the State has been proven beyond a reasonable doubt that the circumstances are --

THE COURT: Statutory.

MS. CLARK: -- statutory --

THE COURT: Aggravating.

MS. CLARK: -- aggravating circumstance or circumstances so to list above outweigh any other --

THE COURT: Mitigating.

MS. CLARK: -- mitigating circumstances. Therefore, we, the jury, unanimously find that the punishment for the defendant, Ronnie --

THE COURT: Cauthern.

MS. CLARK: -- Cauthern shall be death.

THE COURT: Be seated please.

The Supreme Court dealt with this very issue in Kirkendoll v. State, 281 S.W.2d 243 (Tenn. 1955), a case wherein the death penalty was affirmed. The Court held it was not error for the trial judge to accept a juror who could not read the written charges given by the court. Id. at 255. The Supreme Court reasoned as follows:

> We think though that other jurors if necessary could read this to that juror who could not read while in the jury room. The purpose of having the written charge before them . . . was to prevent and keep the jury from having to keep running backward and forward into court getting the court to recharge them on various and sundry little things that they might have forgotten. It seems to us that as long as this written charge is in the jury room that there are others there who can read that this would satisfy that question. Consequently this assignment must be overruled. Id.

We believe that the holding and reasoning in Kirkendoll is dispositive of the issue before us here. The appellant has failed to point to anything in the record, apart from the difficultly in the reading of the verdict form, which suggests Ms. Clark did not understand the oral charges given by the judge. Nor has the appellant demonstrated that he suffered any prejudice as a result of the Ms. Clark's reading skills. Accordingly, we conclude that this issue is without merit.

## INDIVIDUAL AND SEQUESTERED VOIR DIRE

Next, the appellant claims the trial court erred when it denied the appellant's motion for individual and sequestered voir dire. Specifically, the appellant contends the prospective jurors may have been aware of the facts of this case prior to the hearing. The State contends the trial court acted appropriately.

The appellant filed a pre-trial motion requesting permission to conduct individual and sequestered voir dire of the prospective jurors. The trial court denied the motion. During the voir dire, the prosecutor asked, among others, the following

questions:

> Have any of you heard or read anything at all about this case?
>
> Have any of you heard anyone express an opinion about what ought to happen in this case?
>
> There will be testimony that this crime occurred in Clarksville, Tennessee. This is a case, by the way, about two Army nurses, a husband, Patrick Smith, and his wife, Rosemary. This crime occurred either on the night of January the 8th, 1987 or the early morning hours of January the 9th. Mr. and Mrs. Smith -- Captain Smith and Captain Smith were captains in the Army -- were at home asleep when two defendants, Ronald Cauthern and another man, broke into their home, attacking both of them, raped Mrs. Smith, garroted -- that's a term you may not know the meaning of right now, but if you're chosen as a juror you will before this case is over -- and left them both dead. Now, have any of you ever heard anything about this fact situation?
>
> Is there anybody here who doesn't think they can give the defendant a fair trial?

The prospective jurors all responded negatively to each of these questions.

Individual and sequestered voir dire is required only when there is a "significant possibility" that the prospective jurors have been exposed to potentially prejudicial material before the trial. State v. Howell, 868 S.W.2d 238, 247 (Tenn. 1993); State v. Harris, 839 S.W.2d 54, 65 (Tenn. 1992). The decision of whether to grant individual and sequestered voir dire of prospective jurors lies within the sound discretion of the trial judge, and that decision will not be overturned absent a finding of "manifest error." Howell, 868 S.W.2d at 247-48; Harris, 839 S.W.2d at 65.

The appellant has failed to demonstrate in the case at hand any prejudice resulting from the trial court's denial of his motion. All of the prospective jurors indicated they had no knowledge of the facts or circumstances of this case. The fact that the jury knew the appellant was already convicted of first degree murder,

contrary to the appellant's claim, is irrelevant to this issue. The nature of the proceedings in a capital case necessarily creates a situation where the sentencing jury will always know the guilt determination. The fact that this was a resentencing hearing does not present any substantial distinctions, especially when the jury was unaware of the prior proceedings. Accordingly, we find that the trial court did not abuse its discretion in denying the appellant's motion.

## MERCY INSTRUCTION

The appellant claims the trial court should have instructed the jury that it could recommend mercy when rendering its sentence. The Supreme Court has continually upheld the trial court's decision in this respect. See State v. Bigbee, 885 S.W.2d 797, 813-14 (Tenn 1994); State v. Cazes, 875 S.W.2d 253, 269 n.6 (Tenn. 1994); State v. Hartman, 703 S.W.2d 106, 119 (Tenn. 1985); State v. Melson, 638 S.W.2d 342, 366 (Tenn. 1982). Accordingly, this issue is without merit.

## EVIDENCE OF THE UNDERLYING FELONIES

The appellant also alleges that the trial court erred by denying his motion to prevent the State from introducing evidence of the underlying burglary and rape. He contends this evidence did not relate to either the aggravating or mitigating circumstances and thus was improperly before the jury. In response, the State asserts that the trial court acted appropriately.

Prior to trial, the appellant filed a motion to prevent the State from introducing evidence of the underlying burglary and rape. The trial judge denied the motion, stating:

> This was all evidence that was originally introduced at the original trial -- at the guilt phase of the trial, and I think the jury is entitled to all the evidence from the guilt phase of the trial in making their determination as to what the proper punishment is. I think that's the law. I don't think that the rape itself could be an aggravating circumstance, but evidence of the rape could go to the proof of the aggravating circumstance that you're alleging, and for that reason that's why I'm going to allow the introduction.

In his argument before the Court, the appellant seems to suggest that the Supreme Court's holding in State v. Middlebrooks, 840 S.W.2d 317 (Tenn. 1992) controls this issue. Middlebrooks stands for the proposition that the State cannot

rely upon the underlying felony in support of the aggravating circumstance that the murder was committed in the perpetration of a felony when the appellant was convicted of felony murder. Id. at 346. In the instant case, however, the State sought to prove the existence of only one aggravating circumstance, that the murder was heinous, atrocious, or cruel. Thus, there is no duplication problem like that encountered in Middlebrooks. Id.

Moreover, in State v. Cazes, 875 S.W.2d 253, 270 (Tenn. 1994), the Supreme Court, while conducting a Middlebrooks harmless error analysis, stated: "A sentencing jury may properly hear evidence regarding the circumstances of the offense." See also State v. Smith, 893 S.W.2d 908, 925 (Tenn. 1994). As the trial court implied, the jury must be allowed to consider the circumstances surrounding the murder in order to appropriately determine the existence of the heinous, atrocious, or cruel aggravating circumstance. The circumstances surrounding the murder include evidence of the separate felonies. The trial court ruled, however, that the State could not inform the jury that the appellant had been convicted of burglary and rape. Because we believe the trial court acted appropriately in this regard, we find no merit to this issue.

## EXCLUSION OF PROSPECTIVE JUROR

The appellant maintains that the trial judge committed reversible error by excusing a prospective juror because of his perceived views on capital punishment. During voir dire, a prospective juror informed the prosecutor that he did not think he could "live with" the imposition of the death penalty. Subsequently, the judge asked the prospective juror if he could follow the law. He responded by stating that "the Lord makes the decision on death," and that he did not think he could impose the

penalty.  The judge thereafter excused the man from the jury.

The applicable standard for determining whether a juror was properly excused for cause because of his beliefs on the death penalty was delineated in Wainwright v. Witt, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985), and is as follows:  "whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" See State v. Alley, 776 S.W.2d 506, 518 (Tenn. 1989) (Tennessee Supreme Court adopts Wainwright standard).  Furthermore, the United States Supreme Court held that "this standard does not require that a juror's bias be proved with 'unmistakable clarity.'" Wainwright, 469 U.S. at 424, 105 S.Ct. at 852.  The Court also noted that "deference must be paid to the trial judge who sees and hears the jurors." Id. at 426, 105 S.Ct. at 853.

We agree that the prospective juror's answers suggesting that he could not impose the death penalty "would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" Id. at 424, 105 S.Ct. at 852.  See also, State v. Smith, 893 S.W.2d 908, 915-16 (Tenn. 1994). Although this determination might not be "unmistakably clear," it need not be. Moreover, as the United States Supreme Court has held, great deference should be given to the trial judge, who is "left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law." Wainwright, 469 U.S. at 426, 105 S.Ct. at 853.  The trial judge's findings "shall be accorded a presumption of correctness and the burden shall rest upon the appellant to establish by convincing evidence that [those findings were] erroneous." State v. Alley, 776 S.W.2d 506, 518 (Tenn. 1989).  The appellant has failed to meet his burden in this

case.

The appellant also contends that excusing the prospective juror because of his religious beliefs further interferes with the appellant's constitutional rights. Our Supreme Court has ruled that because a juror's "'views on capital punishment may have had a religious foundation does not necessarily transform the test mandated by the United States Supreme Court in [Wainwright v. Witt] into religious tests for . . . [constitutional purposes].'" State v. Jones, 789 S.W.2d 545, 547 (Tenn. 1990) (1990) (quoting State v. Bobo, 727 S.W.2d 945, 949 (Tenn. 1987)). Accordingly, Mr. Williams' opposition to the death penalty, though possibly based on religion, appropriately rendered him unfit as a juror. The trial judge acted properly, and this issue, therefore, is without merit.

## ADMISSION OF APPELLANT'S STATEMENTS

The appellant, relying on his brief submitted during the initial direct appeal of this case, argues that the trial court erroneously allowed the introduction of the appellant's statements into evidence. The Supreme Court previously addressed this issue on the original appeal of this case. See State v. Cauthern, 778 S.W.2d 39 (Tenn. 1989). The remand of this case was based upon the Court's determination that a portion of the appellant's statement was erroneously introduced. Id. at 47. During the resentencing hearing, the trial court followed the Supreme Court's mandate and excluded the objectionable portions of the statement. Accordingly, because the Supreme Court has already addressed this issue, the appellant's argument must fail.

## CONSTITUTIONALITY OF THE DEATH PENALTY

Finally, the appellant asserts the death penalty is cruel and unusual punishment in violation of the state and federal constitutions. On direct appeal, the Supreme Court rejected this argument. See State v. Cauthern, 778 S.W.2d 39, 47 (Tenn. 1989). Likewise, the Court has repeatedly upheld the constitutionality of the death penalty in the face of similar challenges. See State v. Smith, 893 S.W.2d 908 (Tenn. 1994); State v. Brimmer, 876 S.W.2d 75 (Tenn. 1994); State v. Cazes, 875 S.W.2d 253 (Tenn. 1994); State v. Smith, 857 S.W.2d 1 (Tenn. 1993); State v. Black, 815 S.W.2d 166 (Tenn. 1991); State v. Boyd, 797 S.W.2d 589 (Tenn. 1990); State v. Teel, 793 S.W.2d 236 (Tenn. 1990); State v. Thompson, 768 S.W.2d 239 (Tenn. 1989). Accordingly, this argument is without merit.

**CONCLUSION**

After a thorough review of the issues and the record before us as mandated by Tennessee Code Annotated section 39-13-206(b) and (c), and for the reasons stated herein, we affirm the appellant's sentence of death. We conclude that the sentence was not imposed in an arbitrary fashion, the evidence supports the jury's finding of the aggravating circumstance, and the evidence supports the jury's finding that the aggravating circumstance outweighs any mitigating circumstances. Moreover, a comparative proportionality review, considering both the circumstances of the crime and the nature of the appellant, convinces us that the sentence of death is neither excessive nor disproportionate to the penalty imposed in similar cases.[8]

---

[8] No execution date is set in this opinion. Tennessee Code Annotated section 39-13-206(a)(1) provides for automatic review by the Tennessee Supreme Court upon affirmance of the death penalty. If the sentence of death is upheld by the Supreme Court on review, that court will set the execution date.

Accordingly, the judgment of the trial court is affirmed.

-53-

_____
DAVID H. WELLES, JUDGE


CONCUR:


_____
DAVID G. HAYES, JUDGE


_____
CORNELIA A. CLARK, SPECIAL JUDGE